## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                                      **No. 17-201**

**ROBERT BRUMFIELD, III**                            **SECTION I**
**JEREMY ESTEVES**

### <u>ORDER & REASONS</u>

Before the Court is Jeremy Esteves' and Robert Brumfield's ("defendants")
motion[1] for a new trial, which alleges that the government suppressed material
impeachment evidence pertaining to two of the government's cooperating witnesses,
in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405
U.S. 150 (1972). The government opposes[2] the motion. For the reasons that follow,
the motion will be denied.

### I.   BACKGROUND

This action arises out of an armed robbery of a Loomis armored truck that
occurred on December 18, 2013 at a Chase Bank branch in New Orleans, Louisiana
("the Loomis robbery").[3] Hector Trochez, a Loomis security guard, was shot and killed
during the course of the robbery.[4] Esteves and Brumfield were indicted on three
charges: conspiracy to obstruct commerce by robbery, in violation of 18 U.S.C. §

---

[1] R. Doc. No. 1587.
[2] R. Doc. Nos. 1603, 1613, 1617.
[3] R. Doc. No. 237.
[4] *Id.*

1951(a); obstruction of commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; and using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1), and 2.[5]

Defendants' trial began on November 4, 2019. On November 6, 2019, defendants discovered that the government had failed to disclose consensual recordings of telephone calls made by FBI informant and cooperating witness Jamell Hurst ("Hurst") in connection with the Loomis robbery case.[6] On November 7, 2019, defendants orally moved for declaration of a mistrial.[7] The Court continued the trial to November 11, 2019 to allow defense counsel sufficient time to review the newly-produced materials.[8] Brumfield and Esteves subsequently filed written motions[9] requesting a mistrial on November 7 and 10, respectively.

The Court will summarize only those aspects of the mistrial motions that provide relevant background for the instant motion for new trial. In relevant part, Esteves' motion noted that, in addition to its failure to disclose the aforementioned

---

[5] R. Doc. No. 237. The Court granted Esteves' and Brumfield's motions to sever their trials from the trials of their three codefendants—Lilbear George ("George"), Curtis Johnson Jr. ("Johnson"), and Chukwudi Ofomata ("Ofomata")—who, unlike Brumfield and Esteves, were facing the death penalty. R. Doc. No. 537. George and Ofomata ultimately plead guilty and were sentenced on September 29, 2021. R. Doc. Nos. 1497, 1499. Johnson proceeded to a July 2021 trial, which resulted in a mistrial due to the jury's inability to reach a verdict. R. Doc. No. 1450. Johnson's second trial is set for March 28, 2022. R. Doc. No. 1575.

[6] R. Doc. No. 1584, at 245–61.

[7] R. Doc. No. 719, at 1.

[8] *Id.*

[9] R. Doc. Nos. 716, 723.

consensual recordings, the government also failed to produce the FBI's informant file on Hurst until November 8, 2019,[10] despite the government's previous assurances that it had inspected all FBI files in the case and found nothing favorable to disclose.[11]

The newly-disclosed FBI file noted an April 14, 2014 agreement between Assistant United States Attorney Michael McMahon and Assistant District Attorney Graymond Martin that the Orleans Parish District Attorney's Office ("OPDA") would not "extradite" Hurst in connection with the New Orleans Police Department's ("NOPD") outstanding warrant pertaining to a 2013 aggravated burglary.[12] Hurst was living in Houston in April 2014.[13]

The Court heard argument with respect to the mistrial motions outside the presence of the jury on November 11, 2019.[14] When counsel for defendants raised the issue of the extradition agreement, counsel for the government appeared to not be aware of, or to not recall, any such agreement. AUSA Brittney Reed stated that she

---

[10] R. Doc. No. 723, at 2; R. Doc. No. 1585, at 9–10.

[11] Defendants contended that, at an October 30, 2019 hearing before U.S. Magistrate Judge Douglas, AUSA Michael McMahon stated for the record "at his peril" that the government had inspected all relevant FBI files and had nothing further to disclose. R. Doc. No. 723, at 4; *see also* R. Doc. No. 1606, at 19 (transcript of conference before Judge Africk, wherein counsel for Esteves recounts McMahon's statements at the hearing before U.S. Magistrate Judge Douglas, and McMahon recalls that he stated at said hearing that the government would review the files for "any favorable information").

[12] R. Doc. No. 1585, at 12. Evidence as to the aggravated burglary is also detailed *infra*, p. 10.

[13] R. Doc. No. 1585, at 68. Hurst met with Special Agent Elmer in Houston several times during the first half of April 2014, and was registered as an FBI informant on April 15, 2014. *Id.* at 51. Hurst moved back to New Orleans sometime after he became an FBI informant. *Id.* at 91.

[14] *Id.* at 4–18.

did not know what defense counsel was referring to, and stated that "there was no deal that was struck with the D.A.'s Office as it relates to not extraditing Mr. Hurst. He wasn't even here on any local charges. The charges stemmed from a Texas arrest."[15] When asked whether he had any part in that arrangement, AUSA McMahon stated that he had "no recollection of ever agreeing not to extradite Hurst. Hurst was not charged here."[16] When asked whether he had "any role with respect to the issue of extradition of Mr. Hurst," McMahon stated that he did not.[17]

The Court denied the mistrial motions, finding that the alleged prosecutorial failure was not so prejudicial that it would have a substantial impact on the jury's verdict, particularly because the Court granted defendant's request for a continuance of trial, affording counsel sufficient additional time to review the newly-disclosed materials prior to examining Hurst.[18]

On subsequent cross-examination, Hurst stated that he did not know that he had an outstanding warrant for aggravated burglary when he began to work with the FBI in early 2014.[19] He stated that the burglary charges had been dropped because the victim signed an affidavit stating that he had mistakenly identified Hurst as the perpetrator.[20]

---

[15] *Id.* at 11.

[16] *Id.* at 12.

[17] *Id.* at 13.

[18] *Id.* at 14; R. Doc. No. 724.

[19] R. Doc. No. 1585 at 103–04.

[20] *Id.* at 105.

Special Agent Elmer initially testified that he did not believe that Hurst had any outstanding warrants when the FBI registered him as an informant in April 2014.[21] Once Elmer was shown the above-described FBI informant file, he testified that although he had no recollection of the outstanding NOPD warrant for aggravated burglary, the file indicated that the FBI must have confirmed that the OPDA did not want Hurst arrested for the burglary at that time.[22] Elmer also stated that he "did not intervene [on Hurst's behalf] in anything with NOPD or Orleans Parish."[23]

The jury returned its verdict on November 13, 2019.[24] Esteves was found guilty as to all three counts with which he was charged in the second superseding indictment. Brumfield was found guilty only as to conspiracy to obstruct commerce by robbery.[25]

In October 2021, counsel for Ofomata disclosed evidence obtained during the investigation of Ofomata's case to counsel for Esteves and Brumfield.[26] The evidence pertains to Hurst and Lydell Hinton ("Hinton"), another cooperating witness.

Defendants now move for a new trial, alleging that the government suppressed evidence relating to Hurst and Hinton in violation of *Brady* and *Giglio*. Specifically, defendants argue that the government failed to disclose certain benefits that Hurst received in exchange for his cooperation, and that it also failed to disclose that Hurst

---

[21] *Id.* at 225–26.

[22] *Id.* at 230.

[23] *Id.* at 253.

[24] R. Doc. No. 729.

[25] *Id.*

[26] R. Doc. No. 1587-1, at 2.

reported that he has mental health issues and lost consciousness several years prior to the trial. With respect to Lydell Hinton, defendants argue that newly discovered evidence indicates that the government only adopted the prosecution of Hinton relating to a state sex crime arrest in order to leverage his cooperation in the Loomis robbery case, and that the government had an obligation to disclose said documents to defendants. The Court will summarize Hurst's and Hinton's testimony, and defendants' evidence pertaining to each witness, below.

## A. Jamell Hurst

### 1. Trial Testimony

Hurst was one of the government's cooperating witnesses, and he also served as an informant in the FBI's investigation of the Loomis truck robbery. At trial, Hurst testified that George confessed to him that George, Esteves, Ofomata, and Johnson committed the Loomis robbery and also that George showed him some of the bullet hole-riddled currency that was taken during the robbery.[27] On cross-examination, Hurst conceded that he had initially withheld information from, and lied to, the FBI about some aspects of George's statements. He explained that he did so because he feared for his safety, and he also stated that he subsequently told the full truth to the FBI.[28] In particular, counsel for Esteves emphasized on cross-examination that

---

[27] R. Doc. No. 1584, at 236–40; R. Doc. No. 1585, at 66–73, 134.
[28] R. Doc. No. 1585, at 95–100, 102–03, 131–34.

Hurst's account as to when, where, and how George made various admissions to him had changed over time.[29]

Hurst testified that Esteves confessed that Esteves, George, Ofomata, and Johnson committed the robbery, and that Esteves drove the vehicle used during the robbery.[30] Hurst also testified that Brumfield told him about the plan to rob the Loomis truck prior to the robbery.[31] According to Hurst, Brumfield told him about the surveillance that he and the robbers conducted at the Chase Bank prior to the robbery, and that Brumfield described Hector Trochez as "fat" and "clumsy."[32] Hurst testified that Esteves told him that although Brumfield was originally supposed to participate in the robbery, the other participants concluded that Brumfield would "freeze up," and they therefore replaced him with George.[33]

With respect to his own criminal history and relationship with the government, Hurst testified that he was arrested in Brazoria County, Texas for credit card fraud in January 2014, and he began to serve as an informant for the United States Secret

---

[29] Hurst testified that George first made some inculpatory statements to Hurst sometime in January 2014. R. Doc. No. 1584, at 239. Hurst first met with the FBI on February 24, 2014. R. Doc. No. 1585, at 103. Crucially, some details of the Loomis robbery were first published on April 9, 2014 on NOLA.com. R. Doc. No. 1585, at 68. Hurst testified that George shared further details about the robbery on the day that the article was published. *Id.* at 107. Hurst had his next meeting with the FBI after this conversation with George. *Id.* at 110. During cross-examination, counsel for Esteves highlighted that Hurst had been unclear or inconsistent in his testimony regarding which statements George made to him before and after the publication of the article. *Id.* at 132–34.

[30] *Id.* at 86–87.

[31] *Id.* at 80–81.

[32] *Id.* at 81.

[33] *Id.* at 86–87.

Service in its credit card fraud investigation.[34] FBI Special Agent Elmer testified that Hurst told the Secret Service that he knew about the Loomis robbery and wanted to provide information to law enforcement.[35] Elmer, who was the case agent heading the FBI's investigation of the Loomis robbery, testified that he first met with Hurst in February 2014.[36] Hurst became a registered FBI informant in April 2014.[37]

Hurst testified that, at the time of defendants' November 2019 trial, he was in pretrial detention in East Baton Rouge Parish for charges of simple burglary, home invasion, criminal damage, aggravated assault, sexual battery of a six-years-old child, and indecent behavior with a juvenile, and he stated that the charges had not yet been accepted.[38] When questioned about any benefits he expected or received for his testimony, Hurst testified that counsel for the government told him that they would inform the Baton Rouge district attorney or judge overseeing his pending charges of any testimony that Hurst provided in the Loomis robbery case, but counsel emphasized that they would not have any control over the sentence that Hurst might receive in state court.[39] Hurst also testified that, during his time as an informant, the FBI gave him $1200 to assist him in purchasing a phone and moving back to New Orleans, which would enable him to further assist in the FBI's investigation.[40] Finally, Hurst

---

[34] R. Doc. No. 1584, at 238–39.

[35] R. Doc. No. 1585, at 42.

[36] *Id.*

[37] *Id.* at 51.

[38] R. Doc. No. 1584, at 225, 227; R. Doc. No. 1585, at 90.

[39] R. Doc. No. 1584, at 227–28; R. Doc. No. 1585, at 89–90.

[40] R. Doc. No. 1585, at 91.

testified that he was interested in receiving the $50,000 Crimestoppers reward for the information he provided in this case.[41]

### 2. *Newly Discovered Evidence*

Defendants submit seven recorded telephone calls between Hurst and his mother, made in May and June of 2019 while Hurst was incarcerated at the Brazoria County Detention Center for a probation violation.[42] During the calls, Hurst repeatedly urges his mother to contact FBI Special Agents Steven Rayes and Zachary Elmer, to provide them with names of individuals associated with the Loomis robbery,[43] and to request their assistance in getting Hurst out of jail.[44]

During one call, Hurst's mother states that Special Agent Rayes instructed her not to include Rayes on a three-way call with herself and Hurst, because Rayes would have to report it; Hurst's mother states that Rayes instructed her to instead relay information between Hurst and Rayes.[45] Hurst's mother reports that Special Agent Rayes told her "he got in contact with the district attorney" and he was "lookin[g] into the case,"[46] and that he had spoken with the U.S. Attorney's Office about the situation.[47]

---

[41] *Id.*

[42] R. Doc. No. 1613, Exhibits 1–7 (transcription of calls); R. Doc. No. 1613-2, at 2 (Hurst states he is in jail due to a probation violation).

[43] R. Doc. No. 1613-1, at 6–8.

[44] *See, e.g.*, R. Doc. No. 1613-2, at 2, 4.

[45] R. Doc. No. 1613-3, at 2 ("[Rayes] gave me his number, but he said we can't um… put him on 3-way, because if you said somethin' that you not 'posed to say. He gon' have to report that . . . . He told me to you talk to me and I call him back.").

[46] R. Doc. No. 1613-2, at 2.

[47] *Id.* at 6.

Although the calls are somewhat unclear, Hurst appears to indicate that he also made direct contact with Special Agent Rayes at some point, presumably by using another inmate's cell phone.[48] Hurst indicates that his original court date was supposed to be in 40 days, "but [Rayes] brought it a good bit earlier."[49] Hurst also states that Rayes "told me he could help me. He said [he] could have me going to court in ten days and get everything dismissed."[50]

Additionally, Hurst repeatedly states that Special Agent Elmer "got [Hurst] out" of jail in 2015,[51] although he does not provide further detail. Hurst twice states that, prior to his grand jury testimony in this case, Special Agent Rayes and AUSA McMahon "told [Hurst] they can get [him] out of anything, as long as it ain't murder."[52]

In addition to the jail calls, defendants submitted the following evidence:

1. A NOPD incident report regarding a December 2013 aggravated burglary, which states that the victim was presented with a photo lineup and concluded that he/she was "one hundred percent sure" that Hurst committed the burglary.[53] Defendants assert that "Hurst committed perjury when he testified that the charges in New Orleans . . . regarding his arrest for aggravated burglary were dropped [by February 2014] because the victim signed an affidavit saying he didn't do it [and that the

---

[48] R. Doc. No. 1613-7, at 5 (Hurst states that he "talked to [Special Agent Rayes] earlier but . . . dude had run out of money on his phone who was doin' it for me.").

[49] R. Doc. No. 1613-2, at 10.

[50] R. Doc. No. 1613-7, at 5.

[51] R. Doc. No. 1613-3, at 8; *see also* R. Doc. No. 1613-3, at 5 (Hurst tells his mother that the district attorney can be urged to "cut me some leniency cause I'm the [confidential informant], they can do that. That's what [Special Agent Elmer] did."); R. Doc. No. 1613-5, at 7; R. Doc. No. 1613-7, at 2.

[52] R. Doc. No. 1613-4, at 1.

[53] R. Doc. No. 1587-18.

victim stated that it] was a case of mistaken identity."[54] As detailed *supra*, pp. 3–5, the arrest warrant arising from this burglary was the subject of some confusion or dispute at trial; the FBI's file on Hurst indicates that the warrant was outstanding when Hurst became an FBI informant in April 2014.

2. A January 31, 2014 investigative report[55] from Brazoria County, Texas, which indicates that Hurst was arrested with approximately 37 credit cards, pills, and marijuana, and a subsequent indictment[56] charging Hurst with credit card fraud pertaining to only two credit cards. Defendants state that the "government allowed the jury to hear . . . [only] that Mr. Hurst plead guilty to credit card fraud and received probation, two years deferred."[57] Defendants speculate that the disparity between the number of credit cards which Hurst was arrested in possession of, and the number of credit cards referenced in his indictment, indicate that he received a "substantial benefit" resulting from his cooperation with the FBI in the Loomis robbery investigation.[58]

3. A Baton Rouge Police Department incident report, which details Hurst's November 2014 arrest for simple battery.[59] The report states that in the course of investigating the battery, an officer ran Hurst's information, and discovered that he had an outstanding warrant for burglary issued by the NOPD (presumably, the same 2013 aggravated burglary warrant detailed *supra*, pp. 3–5, 10–11).[60] The report states that the officer was initially advised that the NOPD wanted Hurst booked, but that the officer was subsequently advised by the OPDA to release Hurst because he was an informant.[61]

4. A Louisiana Department of Public Safety and Corrections file on Hurst, containing dated reports by probation officers, which stated that, on June 6, 2015, the officer learned "that the subject had been questioned regarding a possible misd[emeanor] theft/shoplifting charge when it was discovered

---

[54] R. Doc. No. 1587-1, at 10 (citing R. Doc. No. 1585, at 105).

[55] R. Doc. No. 1587-6.

[56] R. Doc. No. 1587-10.

[57] R. Doc. No. 1587-1, at 8.

[58] Elmer testified that he did not intervene on behalf of Hurst in his credit card fraud case, stating that "[Hurst] didn't ask for [help]. We didn't need to [help him]." R. Doc. No. 1585, at 252, 253.

[59] R. Doc. No. 1587-11.

[60] *Id.* at 7.

[61] *Id.*

that [Hurst also] had an active warrant issued by Texas [on] April 20, 2015 . . . Texas indicated that they were coming to get [Hurst]."[62] Another entry states that Special Agent Elmer called on the same date that the Texas arrest warrant was issued, April 20, 2015, and asked to speak with Hurst's supervising probation officer.[63] An earlier entry notes that Elmer called in October 2014 seeking Hurst's contact information and stating that he was trying to retrieve "some type of FBI issued equipment."[64] Defendants state that the government consistently argued that it did not provide equipment to Hurst.[65]

5. A February 2018 form entitled "Collection of Information for Mental Illness and Intellectual Disability," which states that Hurst reported having mental illness—specifically, depression.[66]

6. A May 2019 "Screening Form for Medical/Mental Development," which states that Hurst lost consciousness 3–4 years prior, but does not further elaborate on the circumstances of the incident.[67]

## B.  Lydell Hinton

### 1. *Trial Testimony*

Lydell Hinton also served as one of the government's cooperating witnesses. At trial, he testified that Brumfield came to Hinton's recording studio, looking to record a rap song, instigated by the fact that the FBI had questioned Brumfield about the Loomis robbery.[68] Hinton advised him not to do so.[69] Hinton testified that Brumfield told him that he participated in the robbery.[70] Specifically, he testified that Brumfield

---

[62] R. Doc. No. 1587-12, at 3.

[63] *Id.*

[64] *Id.* at 2.

[65] R. Doc. No. 1587-1, at 9.

[66] R. Doc. No. 1587-15.

[67] R. Doc. No. 1587-16.

[68] R. Doc. No. 722, at 18–19, 44.

[69] *Id.*

[70] *Id.* at 44–45.

told him he was waiting on standby to pick up the individuals who had committed the robbery, after they drove away from the scene of the robbery.[71] Hinton also testified extensively about his prior federal conviction for conspiracy to transport individuals to engage in prostitution, the benefits he had already received for his cooperation in the Loomis robbery case, and additional benefits he might receive for his testimony.[72]

### 2. Newly Discovered Evidence

Defendants submit documents pertaining to Hinton's arrest and prosecution for sex crimes. The first document is a September 2013 Orleans Parish District Attorney's Office "Sex Crime Charge Conference Sheet" pertaining to the arrest, which states that "[t]he AUSA is hedging" on the case.[73] The second and third documents are letters between the U.S. Attorney's Office and the Orleans Parish District Attorney's Office, in which the latter grants permission to adopt the sex trafficking arrest for federal prosecution in November 2015.[74] Defendants argue that the federal government's decision to adopt the prosecution of Hinton, after two years of declining to do so, "make[s] clear . . . that Lydell Hinton's 'deal' and indeed his

---

[71] *Id.* at 19.

[72] Hinton testified that he was initially charged with conspiracy to commit sex trafficking of a child and pled to the reduced charge of conspiracy to transport individuals to engage in prostitution. *Id.* at 31–32. He was extensively cross-examined about his plea agreement. *Id.* at 37–42. He stated that he was testifying with the hope that he would be released from incarceration. *Id.* at 39–40. He testified that he was aware that the government offered to write a letter to the Bureau of Prisons requesting that he be excused from registering as a sex offender based on the reduced charge to which he pled guilty. *Id.* at 48–49.

[73] R. Doc. No. 1587-20, at 3.

[74] R. Doc. No. 1587-21.

entire federal prosecution was nothing more than a concerted plan to leverage a statement regarding the Loomis armored car robbery from him," and submit that this strategy should have been disclosed to defendants, so that they could have cross-examined Hinton about it.[75]

## II.  LAW AND ANALYSIS

### A.  The *Brady* Standard

"Under *Brady* and its progeny, due process requires that the prosecution disclose evidence that is both favorable to the defendant and material to guilt or punishment." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018) (citing *Brady*, 373 U.S. at 87). "This duty to disclose exists irrespective of a request from the defense . . . and extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Id.* at 161–62 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976); quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). "*Giglio* applies *Brady* to evidence affecting the credibility of key government witnesses." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016) (citing *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010)).

To obtain a new trial under *Brady* and its progeny, defendants must demonstrate that "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (citing

---

[75] R. Doc. No. 1587-1, at 14.

*Brady*, 373 U.S. at 87); *accord Davis*, 609 F.3d at 696.[76] The Court will analyze the alleged *Brady* violations pertaining to Hinton and Hurst in turn.

## B. Lydell Hinton

An extensive *Brady* analysis of defendants' Hinton-related evidence is not necessary. As even the defendants concede,[77] if the federal government did indeed adopt prosecution of sex crime-related charges against Hinton in order to leverage

---

[76] The Court notes that defendants style their motion for new trial as pursuant to both Federal Criminal Procedure Rule 33 and *Brady*. Rule 33 permits the court to grant a new trial, upon motion by the defendant, "if the interests of justice so require." Courts generally apply the *Berry* rule to motions for new trial based on newly-discovered evidence, brought pursuant to Rule 33. *See, e.g.*, *United States v. Turner*, 674 F.3d 420, 428–29 (5th Cir. 2012). "However, when a motion for new trial based on newly-discovered evidence raises a *Brady* claim, [the court] applies the three-prong *Brady* test to determine whether a new trial is appropriate." *Runyan*, 290 F.3d at 247 (5th Cir. 2002); *see also Turner*, 674 F.3d at 428–29 (separately addressing claims pursuant to *Brady* and Rule 33, and applying the *Brady* test to the former and *Berry* to the latter); *United States v. Mokwuah*, No. 16-254-1, 2019 WL 1407266, at *2 (S.D. Tex. Mar. 28, 2019) ("*Brady* is a separate basis for granting a new trial, independent of Rule 33."); Wright & Miller, 3 Fed. Prac. & Proc. Crim. § 586 (4th ed.) ("Courts do not resolve motions for a new trial based on a claim that the government failed to disclose material falling within *Brady* by using the *Berry* rule."). The *Brady* standard differs from the *Berry* rule in several significant respects. Under *Berry*, defendants must show "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to the defendant's lack of diligence; (3) *the evidence is not merely cumulative or impeaching*; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal." *United States v. Piazza*, 647 F.3d 559, 565 & n.4 (5th Cir. 2011) (emphasis added). Thus, for instance, *Brady* and *Berry* differ because impeachment evidence may form a basis for a new trial under the former but not the latter. *See, e.g.*, *United States v. Wall*, 389 F.3d 457, 470 (5th Cir. 2004) (collecting cases). Accordingly, to the extent that defendants raise an argument for a new trial pursuant to Rule 33 and *Berry*, such an argument fails because, among other things, they have only raised impeachment evidence, and because the Court concludes that defendants' evidence, even if sufficiently substantiated, would not be material, *see supra* p. 27.

[77] R. Doc. No. 1587-1, at 14.

his cooperation in the Loomis robbery case, there is nothing improper about such a tactic.[78] Defendants cite no authority for the proposition that the government has a *Brady* obligation to disclose such a strategy, assuming that the government employed this tactic in this case. The government has a duty to disclose any agreements or benefits provided to the witness in exchange for his cooperation, and the government complied with its duty with respect to Hinton.[79] Further, Hinton was thoroughly examined about his prior conviction, plea agreement, and additional benefits he hoped to receive from his cooperation.[80] Accordingly, even if the government had an obligation to disclose its strategy to defendants, said evidence would have been cumulative and thus not material.

## C.  Jamell Hurst

### *1.  Suppression*

The Court must first determine whether the government suppressed evidence pertaining to Hurst. The government states that it was not in possession of any of the evidence accompanying defendants' motion, and it therefore argues that the government could not have suppressed evidence that it did not possess.[81]

The government is correct in the specific sense that the government had no duty to discover or disclose any of the specific documents or recorded calls pertaining to Hurst. While the government's *Brady* obligation extends to "all evidence known

---

[78] Defendants also do not argue that Hinton was aware of this alleged strategy.

[79] *Id.* at 13–14 (listing the Hinton-related documents that the government produced to defendants).

[80] See *supra* note 72.

[81] R. Doc. No. 1603, at 11–13.

not just to the prosecutors, but to others acting on the government's behalf in the case, including the police," *Floyd*, 894 F.3d at 162 (quotation omitted), the law enforcement and correctional agencies in possession of the documents pertaining to Hurst—with the exception of the NOPD[82]—did not assist in the investigation or prosecution of the case against defendants. *See, e.g.*, *Hall v. Mays*, 7 F.4th 433, 444–45 (6th Cir. 2021) (prosecution had no *Brady* duty to discover and disclose witness's mental health records, which were in the possession of a correctional facility); *United States v. Merlino*, 349 F.3d 144, 154–55 (3d Cir. 2003) (prosecution did not have a Brady obligation to discover and disclose Bureau of Prisons' recordings of witness's phone calls); *United States v. Domiguez*, 2021 WL 4899918, at *2 (E.D. Tenn. Oct. 20, 2021) (the prosecution "has no obligation to seek out and disclose jail communications that it did not review" where "the jailer is not part of the prosecution team"); *United States v. Burnett*, 2013 WL 12334143, at *11 (D.N.M. Mar. 8, 2013) (concluding that the prosecution cannot be deemed to be in possession of jail call records where "the detention facility is not an arm of the prosecution").[83]

---

[82] While the NOPD partnered with the federal government on the Loomis robbery case, the NOPD document at issue—the 2013 incident report regarding aggravated burglary—pertained to an unrelated crime, and thus, the prosecution would not have had a duty to discover and disclose the incident report itself. Of course, insofar as the government intervened with the NOPD or the OPDA to assist Hurst with the arrest warrant arising from this incident, the government had a duty to disclose such intervention.

[83] Accordingly, the Court concludes that the government did not suppress the records pertaining to Hurst's health, R. Doc. Nos. 1587-15, 1587-16, because the government neither possessed the records, nor had a duty to discover them. *Hall*, 7 F.4th at 444–45.

However, the government's argument misses defendants' broader contention: that the government failed to disclose the extent to which it had assisted Hurst in the past and promised to do so in the future. In that sense, some of the new documents are relevant insofar as they indicate that the government may have failed to disclose *other* evidence pertaining to its relationship with Hurst—and not because the specific documents and recordings should have been disclosed to defendants prior to trial.[84]

The Court cannot conclude, based on defendants' evidence alone, that the government indeed suppressed evidence of other benefits or promises made to Hurst. However, assuming for the sake of the present analysis that the government suppressed such evidence, the Court concludes that such evidence, even if favorable, would not be material, as set forth below.[85]

### 2. Favorability

Under the second *Brady* prong, defendants must establish that "the suppressed evidence was favorable to the defense." *Runyan*, 290 F.3d at 247. "[E]vidence impeaching a prosecution witness is favorable *Brady* evidence." *Floyd*, 894 F.3d at 163 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

---

[84] For instance, although the jail call recordings undoubtedly contain statements that could have been used to impeach Hurst and possibly Special Agents Elmer and Rayes, the prosecution did not have a *Brady* duty to discover and disclose the recordings themselves to defendants.

[85] Because the Court concludes that defendants' motion would fail under *Brady*'s materiality prong *even if* defendants could adduce sufficient evidence to prove that the government failed to disclose benefits provided or promised to Hurst, the Court need not hold an evidentiary hearing on the motion.

As stated above, defendants' evidence does not conclusively establish that the government assisted Hurst in the past, or promised to assist him in the future, beyond the benefits that were disclosed at trial. However, assuming for the sake of analysis that defendants would be able to adduce sufficient evidence that the government failed to disclose the extent of benefits Hurst received, such evidence would undoubtedly be favorable impeachment evidence. Indeed, the government concedes as much.[86]

In particular, the recorded jail calls indicate the possibility that Special Agent Elmer interceded on Hurst's behalf to "get [Hurst] out" of jail in 2015.[87] On cross-examination, Hurst testified that he called Special Agent Elmer from jail in Baton Rouge, presumably in 2015,[88] and asked Elmer to come see him.[89] Counsel for defendants did not press Hurst on whether Elmer ultimately interceded on his behalf; nevertheless, the government had a duty to disclose such actions, if they occurred.

The jail calls, while somewhat unclear, also indicate that Special Agent Rayes was attempting to avoid direct contact with Hurst through a jail phone line that

---

[86] R. Doc. No. 1613, at 6–7 ("The government does not dispute the fact that the jail calls are favorable to the defendants in that each of the calls contain information that could have been used by defendant to further impeach Hurst, Elmer, Agent Rayes.").

[87] R. Doc. No. 1613-3, at 8; *see also* R. Doc. No. 1613-3, at 5; R. Doc. No. 1613-5, at 7; R. Doc. No. 1613-7, at 2.

[88] The exact date of this contact was not specified. However, Hurst testified that he called Elmer from jail "a while" after November 21, 2014, R. Doc. No. 1585 at 126, and Hurst's probation file indicated that he was arrested for theft and held in a Baton Rouge jail in 2015, R. Doc. No. 1587-12, at 3. Therefore, the Court assumes that this contact occurred in 2015.

[89] R. Doc. No. 1585, at 126–27.

would be recorded,[90] and also indicate that Hurst contacted Rayes directly, using another inmate's cell phone.[91] Hurst seems to indicate that the result of his direct communication with Rayes was an expedited court date, although this is unclear.[92]

Hurst's mother states that Rayes told her that he contacted either a district attorney, the United States Attorney's Office, or both, regarding Hurst's situation, although it is unclear what, if anything, came of that contact. But Hurst's insistence that Special Agent Rayes and AUSA McMahon "told me they can get me out of anything, as long as it ain't murder," prior to Hurst's grand jury testimony in this case, would be favorable to the defense.[93]

Further, there are two instances indicating that the NOPD and the OPDA declined to execute Hurst's outstanding 2013 warrant for aggravated burglary because he was serving as an informant. First, as discussed *supra*, pp. 3–5, 10–11, Hurst's FBI informant file stated that there was an agreement between the OPDA and AUSA McMahon to this effect. Second, there is the Baton Rouge Police Department incident report regarding the 2014 simple battery, which states that the OPDA advised that, although there was an outstanding NOPD warrant for burglary, Hurst should be released from custody because he is an informant.[94]

---

[90] R. Doc. No. 1613-3, at 2.

[91] R. Doc. No. 1613-7, at 5.

[92] R. Doc. No. 1613-2, at 10; R. Doc. No. 1613-7, at 5.

[93] R. Doc. No. 1613-4, at 1.

[94] R. Doc. No. 1587-11, at 7.

Finally, if defendants' claim that the government intervened on Hurst's behalf with respect to his 2014 credit card fraud charges in Brazoria County were substantiated, that too would be favorable to defendants.

### 3. Materiality

"Evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Dvorin*, 817 F.3d at 451 (quoting *Brown,* 650 F.3d at 588). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Spence v. Johnson,* 80 F.3d 989, 994 (5th Cir. 1996)). Undisclosed evidence is not material when it is "merely cumulative" of other evidence in the record. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004).

The materiality of *Brady* evidence "depends almost entirely on the value of the evidence relative to the other evidence mustered by the [government]." *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (quoting *Rocha v. Thaler,* 619 F.3d 387, 396 (5th Cir. 2010)). "A *Brady* violation is more likely to occur when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.'" *Sipe*, 388 F.3d at 478 (quoting *Rocha,* 619 F.3d at 397); *see also, e.g.*, *id.* at 737–38 (finding suppressed evidence to be material where the prosecution failed to disclose certain assurances made to the witness in exchange for his testimony, where that witness provided "the only direct evidence . . . to show a critical element" of the offense); *Floyd*, 894 F.3d at 166 ("[W]ithheld evidence is more likely material when the State presents a weaker case for guilt." (citing *Smith v. Cain*, 565 U.S. 73, 76 (2012); *Agurs*, 427 U.S. at 113));

*Tassin v. Cain*, 517 F.3d 770, 780 (5th Cir. 2008) (witness's testimony was material where she was the only witness who testified that the defendant planned the armed robbery, and the defendant testified that he did not plan the robbery).

Defendants argue that evidence which indicates that a government witness was "offered generous consideration for their testimony at trial[] is material to the jury's consideration of the defendant's guilt – especially when proof of the identity of the defendant as being in any way connected to the crime is based almost entirely on such a witness's testimony."[95]

The government contends that evidence indicating that "Hurst either requested *additional* benefits, hoped to or anticipated receiving *additional* benefits, or was offered *additional* assistance by the government . . . would have been merely cumulative to the impeaching evidence that was introduced at trial," because "Hurst testified extensively about how he hoped to benefit by serving as a government cooperator."[96]

The Supreme Court has "made clear that an undisclosed source of [a witness's] bias can be material even if it is not the main [or only] source of bias." *LaCaze*, 645 F.3d at 37 (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 270 (1959)). There is a significant difference in degree and kind between the benefits Hurst testified about

---

[95] R. Doc. No. 1587-1, at 5.
[96] R. Doc. No. 1613, at 7 (emphasis in original).

at trial[97] and defendants' allegations that the government interceded to get Hurst out of jail (or otherwise mitigated prior criminal arrests or charges) and that Special AUSA McMahon represented that he could assist Hurst with future charges other than murder. *Cf. Dvorin*, 817 F.3d at 451 ("[E]vidence [that the government agreed to file a favorable motion regarding the witness's sentencing] would be more powerful than [the witness's] testimony that he merely hoped he would receive leniency, but had not received any promise from the government that he would.").

The government also argues that, if the government merely suggested or promised that it would provide some type of assistance to Hurst in exchange for his cooperation, but did not ultimately provide such assistance, then such evidence is not material.[98] This argument is unavailing. "[T]he Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal." *LaCaze*, 645 F.3d at 735. Instead, "the key question is . . . whether the witness 'might have believed that the state was in a position to implement any promise of consideration.'" *Id.* (quoting *Napue,* 360 U.S. at 270; citing *Giglio,* 405 U.S. at 155; *Tassin,* 517 F.3d at 778); *accord Wearry v. Cain*, 577 U.S. 385, 393–94 (2016); *Dvorin*, 817 F.3d at 452.

---

[97] Hurst testified he received $1200 from the FBI to assist him in purchasing a phone and moving back to New Orleans. He also testified that counsel for the government told him that they would inform the district attorney or judge overseeing his pending criminal charges in Baton Rouge about his cooperation, but that they did not have any control over the sentence he would receive. *See supra* notes 38–40 and accompanying text.

[98] R. Doc. No. 1613, at 11.

In sum, the Court is not persuaded by several of the government's arguments as to materiality. It is true that Hurst's credibility was impeached in several respects at trial: in addition to his above-described testimony about the money he received from the FBI and his expectation that the government would inform the district attorney or judge overseeing his pending charges about his cooperation in the Loomis robbery case, Hurst also testified that he bought marijuana from Esteves[99] and he admitted multiple times that he was not initially truthful when he first met with Special Agent Elmer to discuss the Loomis robbery.[100]

Admittedly, assuming for the sake of analysis that defendants could sufficiently prove the existence of undisclosed benefits or promises to Hurst, this undisclosed information could have been used to further impeach Hurst. However, the evidence is immaterial when considered in light of the entire trial record and the government's other evidence. The Court will not exhaustively catalog every witness and item of evidence offered by the government at trial, but it will summarize some of the most significant evidence below.

Cedric Wade, one of the government's cooperating witnesses, provided crucial testimony about the conspiracy and robbery. Wade testified that on the morning of the robbery, Ofomata, Johnson, George, and Esteves arrived at his residence to obtain firearms that would be used in the robbery.[101] He testified that after the robbery,

---

[99] R. Doc. No. 1585, at 121.
[100] *Id.* at 95–96, 98–100, 102, 131. *See also supra* note 29 and accompanying text.
[101] R. Doc. No. 1583, at 222–29.

24

Ofomata returned to his residence and placed money stolen during the robbery inside of an air conditioning unit.[102]

The government also offered the testimony of Tyra Lewis, the owner of the Chevy Tahoe that was used during the commission of the robbery.[103] Lewis testified that her vehicle was stolen a week before the robbery.[104] The FBI found two screwdrivers in the Tahoe.[105] Louisiana State Police DNA Analyst Stacy Williams testified that one of these screwdrivers was determined to have George's DNA on its handle.[106]

Special Agent Elmer testified that Thierry King, an employee of Chase Bank and a person of interest in the case, allowed the FBI to look through her cell phone address book, and the FBI found both Esteves' and Brumfield's numbers in her phone.[107] The FBI subsequently obtained a warrant to seize King's phone.[108] Special Agent Rayes testified that a telephone number associated with Esteves[109] was one of the top ten most frequent numbers with which King had contact.[110]

---

[102] *Id.* at 231.

[103] *Id.* at 82–105.

[104] *Id.* at 83.

[105] *Id.* at 89–90.

[106] *Id.* at 138–40.

[107] R. Doc. No. 1585, at 177–78.

[108] *Id.* at 179.

[109] Special Agent Rayes testified that billing records established that the telephone number was registered to Esteves' mother, but stated that Esteves was the "user" of the phone. *Id.* at 297–98 (discussing Exhibit No. 48).

[110] *Id.* at 297.

FBI Special Agent William Williams testified about the telephone records relating to telephones associated with George, Esteves, and Brumfield.[111] The records demonstrated that a phone associated with George was near the Chase Bank on December 4 and 11, 2013, prior to the December 18, 2013 robbery.[112] Phone records demonstrated that phones associated with Esteves and Brumfield communicated with each other on the morning of the robbery.[113] The records also showed that George's phone traveled near Wade's residence, and then near the Chase Bank on the day of the robbery.[114] Shortly after the robbery, the phone associated with Brumfield utilized a cell phone tower that was near both the Chase Bank and the Adams Street location, which is where the Tahoe was located after the robbery.[115]

Hinton testified that Brumfield arrived at his recording studio wanting to record a rap song about the fact that the FBI had questioned him about the Loomis robbery, and that Hinton advised him not to do so.[116] Hinton testified that Brumfield told him that he participated in the robbery.[117] Specifically, he testified that Brumfield told him he was waiting on standby to collect the individuals who had committed the robbery, after they drove away from the scene of the robbery.[118]

---

[111] R. Doc. No. 1586, at 42–89.

[112] *Id.* at 65.

[113] *Id.* at 60.

[114] *Id.* at 53, 63–64.

[115] *Id.* at 59, 63.

[116] R. Doc. No. 722, at 18–19, 44.

[117] *Id.* at 45.

[118] *Id.* at 19.

Further, he testified that Brumfield told him that one of the conspirators had a girlfriend working at the Chase Bank.[119]

Finally, Special Agent Elmer testified that the FBI found shoeboxes containing $20,617 in cash in Esteves' bedroom at his mother's residence.[120] Elmer also testified that the only information connecting the money to the robbery came from Hurst, who stated that Esteves had shown him the cash and had explained that it was from the robbery.[121] The government was not able to connect the money to the robbery through the use of serial numbers or by looking to the denomination or year that the money was printed.[122] Elmer testified that, during the same search of Esteves' bedroom, the FBI recovered a Chase Bank bill or invoice containing Brumfield's name.[123] Nothing precluded the jury from considering such circumstantial evidence pertaining to the conspiracy.

Hurst was an important witness—albeit one whose credibility was impeached on several grounds—and his testimony not only inculpated several individuals connected with the Loomis robbery, but also assisted the government in presenting its larger narrative regarding the Loomis robbery. However, as the evidence summarized above demonstrates, Hurst was not the only witness as to key elements of the offense, and his testimony was corroborated by other evidence. *LaCaze*, 645

---

[119] *Id.* at 21.

[120] R. Doc. No. 1585, at 194, 240–42, 250.

[121] *Id.* at 249–50.

[122] *Id.* at 251.

[123] *Id.* at 197.

F.3d at 736. The Court, in considering the entire trial record, concludes that the government offered sufficient evidence at trial such that, even if Hurst was further discredited before the jury, there is no "reasonable probability that . . . the result of the proceeding would have been different." *Dvorin*, 817 F.3d at 451 (quoting *Brown,* 650 F.3d at 588). Accordingly,

    **IT IS ORDERED** that the motion for new trial is **DENIED**.

New Orleans, Louisiana, March 4, 2022.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**