# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                                        **No. 17-201**

**JEREMY ESTEVES**                                          **SECTION I**

## <u>ORDER & REASONS</u>

Before the Court is defendant Jeremy Esteves's ("Esteves") memorandum[1] requesting a new trial based on the government's alleged suppression of impeachment evidence during Esteves's 2019 criminal trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. The government opposes[2] the request for a new trial. Esteves filed a reply.[3] On April 23, 2024 and April 29, 2024, the Court held evidentiary hearings with respect to the memorandum.[4] Following the evidentiary hearings, both Esteves and the government submitted supplemental memoranda of law and fact.[5] For the reasons that follow, the Court denies Esteves's request for a new trial.

## I.      BACKGROUND

As the Court explained in a previous order and reasons,[6] this case stems from the December 18, 2023 armed robbery of a Loomis armored truck at a Chase Bank

---

[1] R. Doc. No. 1791.
[2] R. Doc. No. 1798.
[3] R. Doc. No. 1803.
[4] R. Doc. Nos. 1811, 1814.
[5] R. Doc. Nos. 1817, 1818.
[6] R. Doc. No. 1624 (March 4, 2022 order denying motion for a new trial).

branch in New Orleans, Louisiana.[7] Hector Trochez, a Loomis security guard, was shot and killed during the course of the robbery.[8] The government charged Esteves and five codefendants in connection with the robbery and shooting.[9] Esteves was indicted on three charges: (1) conspiracy to obstruct commerce by robbery in violation of 18 U.S.C. § 1951(a); (2) obstruction of commerce by robbery in violation of 18 U.S.C. §§ 1951(a) and 2; and (3) using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1), and 2.[10] Three of the defendants faced the death penalty, while the remaining three defendants—including Esteves—did not.[11]

On September 4, 2019, the Court severed the trial of the three defendants not facing the death penalty from the other defendants' trial.[12] Esteves was tried alongside Robert Brumfield, III ("Brumfield").[13] Esteves's trial began on November 4, 2019.[14] On November 6, 2019, Esteves and Brumfield discovered that the government had failed to disclose consensual recordings of telephone calls made by Federal Bureau of Investigation ("FBI") informant and cooperating witness Jamell Hurst ("Hurst") in connection with the Loomis robbery case.[15] On November 7, 2019,

---

[7] R. Doc. No. 237 (second superseding indictment).

[8] *Id.*

[9] *See generally id.*

[10] *Id.*

[11] R. Doc. No. 537, at 1.

[12] *Id.* at 31.

[13] *See id.* The third non-capital defendant, Jasmine Theophile, pleaded guilty to count 4 of the superseding indictment pursuant to a plea agreement on October 23, 2019. *See* R. Doc. No. 646.

[14] *See* R. Doc. No. 704.

[15] R. Doc. No. 1584 (November 6, 2019 trial transcript), at 245–61.

Esteves and Brumfield orally moved for a mistrial.[16] The Court continued the trial to November 11, 2019 to allow defense counsel sufficient time to review the newly produced materials.[17]

Esteves and Brumfield subsequently filed written motions requesting a mistrial.[18] The motions argued that, in addition to its failure to disclose the consensual recordings, the government had also failed to produce the FBI's informant file on Hurst until November 8, 2019 despite previous assurances that the government had inspected all FBI files in the case and found nothing favorable to disclose.[19] The newly disclosed FBI file noted an April 14, 2014 agreement between Assistant U.S. Attorney Michael McMahon ("AUSA McMahon") and Assistant District Attorney Graymond Martin that the Orleans Parish District Attorney's Office ("OPDS") would not "extradite" Hurst in connection with the New Orleans Police Department's ("NOPD") outstanding warrant pertaining to a 2013 aggravated burglary.[20] Hurst was living in Houston in April 2014.[21]

The Court heard argument with respect to the mistrial motions outside the presence of the jury on November 11, 2019.[22] The Court then denied the motions, finding that the alleged prosecutorial failure to disclose was not so prejudicial that it

---

[16] R. Doc. No. 719, at 1.

[17] *Id.*

[18] R. Doc. No. 716 (Brumfield's motion to declare a mistrial); R. Doc. No. 723 (Esteves's motion to declare a mistrial).

[19] R. Doc. No. 723, at 2; R. Doc. No. 1585 (November 11, 2019 trial transcript), at 9–10.

[20] R. Doc. No. 1585, at 12.

[21] R. Doc. No. 1624, at 3 n.13.

[22] R. Doc. No. 1585, at 4–18.

would have a substantial impact on the jury's verdict, particularly because the Court had granted a trial continuance affording counsel sufficient time to review the newly disclosed materials prior to examining Hurst.[23]

The jury returned its verdict on November 13, 2019.[24] Esteves was found guilty as to all three counts with which he was charged in the second superseding indictment.[25] Brumfield was found guilty only as to conspiracy to obstruct commerce by robbery.[26]

In October 2021, counsel for one of the capital defendants, Chuckwudi Ofomata ("Ofomata"), disclosed to the government and the other defendants' attorneys evidence obtained during the investigation of Ofomata's case.[27] The evidence pertained to Hurst and Lydell Hinton ("Hinton"), another cooperating witness.[28] Based on this evidence, Esteves and Brumfield moved for a new trial.[29] As relevant here, Esteves and Brumfield argued that the government had suppressed evidence of Hurst's benefits in exchange for cooperating, including: (1) recordings of seven phone calls from Hurst to his mother while he was in jail; (2) an NOPD incident report regarding Hurst's 2013 aggravated burglary charge; (3) a Brazoria County, Texas

---

[23] *Id.* at 14; R. Doc. No. 724 (minute entry for November 11, 2019 jury trial reflecting the Court's denial of the motions to declare a mistrial).
[24] R. Doc. No. 729 (jury verdict form as to Brumfield); R. Doc. No. 731 (jury verdict form as to Esteves).
[25] *See generally* R. Doc. No. 731.
[26] *See generally* R. Doc. No. 729.
[27] R. Doc. No. 1587-1 (Esteves's and Brumfield's 2021 memorandum in support of their motion for a new trial), at 2.
[28] *Id.* at 2–3.
[29] *See generally id.*

investigation report showing that Hurst was indicted for fraudulently possessing two credit cards despite being arrested for possessing 37 stolen credit cards and controlled substances; (4) a Baton Rouge Police Department incident report regarding Hurst's 2014 arrest for battery; and (5) a Louisiana Department of Public Safety and Corrections file on Hurst stating that Hurst had an active warrant issued by Texas.[30]

The Court denied the motion, finding that the allegedly suppressed evidence was not material in light of the trial record.[31] Esteves and Brumfield appealed.[32] The U.S. Court of Appeals for the Fifth Circuit found that the allegedly suppressed evidence was immaterial as to Brumfield but material as to Esteves. *United States v. Brumfield*, 89 F.4th 506, 525 (5th Cir. 2023).[33] Accordingly, the Fifth Circuit remanded the case to this Court to consider whether—as to the five categories of evidence—Esteves can satisfy the other elements of a *Brady* claim. *Id.* at 28.

On February 6, 2024, the Court held an in-chambers conference with the parties and set a briefing schedule and an evidentiary hearing.[34] Esteves then filed his memorandum of fact and law requesting a new trial,[35] which the government

---

[30] *Id.* at 6–11; *see also United States v. Brumfield*, 89 F.4th 506, 514 (5th Cir. 2023) (listing the allegedly suppressed evidence to consider on remand).

[31] *See generally* R. Doc. No. 1624.

[32] R. Doc. Nos. 1680 (Brumfield's notice of appeal); R. Doc. No. 1695 (Esteves's notice of appeal).

[33] The Fifth Circuit also rejected Brumfield's challenge to this Court's denial of his motion for a new trial based on *Napue v. Illinois*, 360 U.S. 264, 269 (1959) and denied Brumfield's appeal of his sentence. *Brumfield*, 89 F.4th at 2, 525.

[34] R. Doc. No. 1785.

[35] R. Doc. No. 1791.

opposed.[36] As noted, on April 23, 2024 and April 29, 2024, the Court held evidentiary hearings to determine whether Esteves had satisfied *Brady*'s other prongs.

## II.    STANDARD OF LAW

Pursuant to *Brady* and its progeny, "due process requires that the prosecution disclose evidence that is both favorable to the defendant and material to guilt or punishment." *Floyd v. Vannoy*, 894 F.3d 143, 161–62 (5th Cir. 2018) (citing *Brady*, 373 U.S. at 87). To obtain a new trial based on a *Brady* violation, a defendant must demonstrate that "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002).[37] The suppression of *Brady* evidence violates due process "irrespective of the good or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (quoting *Brady*, 373 U.S. at 87).

With respect to the first prong, "*Brady* requires the prosecution disclose evidence when it is 'of such substantial value to the defense that elementary fairness requires it to be disclosed[.]'" *Floyd*, 894 F.3d at 162 (quoting *United States v. Agurs*, 427 U.S. 97, 110 (5th Cir. 1976)). "This duty to disclose exists irrespective of a request from the defense, . . . and extends to all evidence known not just to the prosecutors,

---

[36] R. Doc. No. 1798.
[37] The Court notes that the three-prong *Brady* test replaces the analysis courts ordinarily perform in deciding a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 and the *Berry* rule. *See* R. Doc. No. 1624, at 15 n.76 (collecting cases).

but 'to the others acting on the government's behalf in the case, including the police[.]'" *Id.* (citing *Agurs*, 427 U.S. at 97, 107 and quoting *Kyles*, 514 U.S. at 437).

However, before a *Brady* claim can arise, the defendant "must show that the prosecution team had access to the evidence." *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005). "It is well settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors." *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (citing *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979)). The determination of whether individuals or agencies belong to the "prosecution team" depends on a "case-by-case analysis of the extent of interaction and cooperation" between those individuals or agencies and the prosecutors pursuant to agency law. *Id.* at 308 (quoting *Antone*, 603 F.2d at 570).

Further, "[e]vidence is not 'suppressed' if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it . . . . The government is not required, in other words, to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own.'" *Runyan*, 290 F.3d at 245–46 (quoting *United States v. Shoher*, 55 F. Supp. 346, 352 (S.D.N.Y. 1983)); *see also United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (explaining that "[w]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no *Brady* claim") (internal quotation marks and citation omitted).

As to the second prong, the U.S. Supreme Court has held that "evidence impeaching a prosecution witness is favorable *Brady* evidence." *Floyd*, 894 F.3d at 163 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

Finally, with respect to the third prong, evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Brumfield*, 89 F.4th at 513–14 (quoting *Bagley*, 473 U.S. at 682). "A reasonable probability is established when the failure to disclose the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 514 (quoting *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002)) (cleaned up). "[S]uppressed evidence [is] considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (5th Cir. 1995).

## III.   ANALYSIS

As explained, the Fifth Circuit remanded this matter for this Court to determine whether the five previously specified categories of evidence satisfy *Brady*'s suppression and favorability prongs. *See Brumfield*, 89 F.4th at 519, 525. Rather than addressing whether the government suppressed each category of evidence and whether it is favorable, Esteves's memorandum and reply assert that the government must have assisted Hurst in avoiding multiple serious charges in state court.[38] Esteves also suggests that "there is more than enough reason to believe" that the government knew about this assistance and failed to disclose it to Esteves in violation

---

[38] *See generally* R. Doc. Nos. 1791, 1803.

of *Brady*.[39] Esteves's argument is based on Hurst's criminal records, which show that several serious state charges against him were either dismissed or reduced.[40] Esteves also points to a transcript of Hurst's sentencing in East Baton Rouge in which a state prosecutor advised the court "that the State took into consideration assistance that this defendant has provided to law enforcement in making this plea offer and that's the reason that we've made the offer that he pled to today."[41] Esteves further stresses that the prosecution must be held accountable even for evidence known only to law enforcement agencies.[42] According to Esteves, the federal prosecutors' failure to disclose these arrangements violated *Giglio v. United States,* 405 U.S. 150 (1972) and their allowing Hurst to lead the jury to believe he could only hope for some assistance with his pending charges violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959).[43]

The government responds that it did not suppress the five categories of evidence at issue on remand and that those categories of evidence were not favorable to the defense within the meaning of *Brady*.[44] Additionally, in the event that the Court finds suppression and favorability satisfied as to some but not all of the evidence at issue, the government requests an opportunity to brief why Esteves cannot establish materiality as to that subset.[45]

---

[39] *See* R. Doc. No. 1791, at 13.
[40] *Id.* at 8–11.
[41] R. Doc. No. 1791-1, at 28 (quoted by R. Doc. No. 1791, at 10).
[42] R. Doc. No. 1791, at 5, 14.
[43] *Id.* at 13.
[44] *See generally* R. Doc. No. 1798.
[45] *Id.* at 1 n.1.

In reply, Esteves argues that the government "ignores all indications of favorable treatment given to . . . Hurst[] by the East Baton Rouge District Attorney's [O]ffice."[46] Esteves states that the government is wrong to suggest that Esteves should have known about the communications between Hurst and FBI Special Agent Steven Rayes ("Rayes").[47] Additionally, the reply clarifies that the relevant member of the prosecution team for purposes of the *Brady* analysis is Rayes.[48] Esteves does not contend that members of the Brazoria County Detention Center or the NOPD are members of the prosecution team.[49]

Pursuant to the Fifth Circuit's opinion remanding this matter, the Court must first consider whether the five relevant categories of evidence satisfy *Brady*'s suppression prong. Ultimately, the Court concludes that the government did not suppress the relevant evidence within the meaning of *Brady*. Accordingly, the Court need not reach *Brady*'s favorability prong.

### a. Suppression

#### *i. Recordings of Jail Phone Calls*

As stated, the first category of evidence includes "[r]ecordings of seven phone calls from Hurst to his mom while he was in jail, in which he asked his mom to call the FBI." *Brumfield*, 89 F.4th at 514. In these phone calls, "Hurst said that [ ] Rayes told him that he could get his charges dismissed and that Rayes and AUSA McMahon

---

[46] R. Doc. No. 1803, at 2.
[47] *Id.*
[48] *Id.* at 3.
[49] *Id.* at 2–3.

told him they could get him out of anything but murder. Hurst's mom reported to Hurst that Special Agent [Zachary] Elmer was working with the [D]istrict [A]ttorney to get him out." *Id.*

The Court finds that the government did not suppress these recordings. At the time of the trial, the prosecution team did not have access to the jail calls and had not listened to them.[50] Additionally, there is no reason to think employees of the Brazoria County Detention Center belonged to the prosecution team since Esteves has not shown any "interaction and cooperation" between the prosecutors and those employees. *Antone*, 603 F.2d at 570. Indeed, as stated, Esteves does not appear to suggest that these employees qualify as members of the prosecution team.[51]

Rather, Esteves argues that these phone calls reflect an arrangement between Hurst and the government that prosecutors never disclosed.[52] However, at the evidentiary hearings, no testimony was elicited supporting Hurst's claim on the recorded calls that he had received assistance from this prosecution team in the past.

During the second evidentiary hearing, former FBI Special Agent Zachary Elmer ("Elmer") credibly denied that he ever tried to help Hurst secure release from

---

[50] R. Doc. No. 1798, at 8–9.
[51] R. Doc. No. 1803, at 2–3 ("Esteves is not now, nor did he ever, argue that the United States must make inquiry of every law enforcement agency in the land with regards to each and every one of its witnesses. That is not the standard and would certainly be an absurd argument. What [ ] Esteves *is* arguing, is that . . . *Kyles* makes clear the responsibility of the government to seek out all *Brady* information in the possession of agencies which are part of the prosecution team. Here, the government needed look no further than [Rayes.]").
[52] R. Doc. No. 1791, at 2–3; R. Doc. No. 1803, at 3.

jail and he denied ever intervening to get Hurst's charges reduced or dismissed.[53] With respect to any allegation that Elmer told Hurst's mother that he was working with the District Attorney to get him out of jail, both Elmer and Hurst's mother denied ever speaking to each other.[54]

Moreover, during the second hearing, McMahon—whose testimony the Court found to be credible—explicitly denied ever telling Hurst he could get him out of anything short of murder.[55] McMahon also testified that he never said "anything like that [statement]" to Hurst "that he could have possibly misconstrued[.]"[56] McMahon further testified that he had no idea why Hurst would tell his mother in the recorded call that McMahon could get him out of anything short of murder.[57] Additionally, McMahon testified that he had no knowledge as to any other Assistant United States Attorney, United States Attorney, or law enforcement official who would have made any promises to Hurst regarding any charges.[58] McMahon also stated that he was not "aware of any individual that engineered any sort of deal on behalf of [ ] Hurst in exchange for his testimony at the trial of [ ] Esteves[.]"[59]

---

[53] Transcript of First Evidentiary Hearing, at 45.
[54] *Id.* at 43, 12. The Court notes that the statement that "Hurst's mom reported to Hurst that Special Agent Elmer was working with the district attorney to get him out[,]" *Brumfield*, 89 F.4th at 514, likely refers to Hurst's mother's communications with Rayes rather than Elmer.
[55] Transcript of Second Evidentiary Hearing, at 38.
[56] *Id.* at 38.
[57] *Id.* at 38–39.
[58] *Id.* at 39.
[59] *Id.* at 43.

During the first evidentiary hearing, Hurst's mother testified that, pursuant to Hurst's request, she reached out to Rayes while Hurst was in jail in May 2019.[60] When she contacted Rayes, he never told her what was going on, but said he would get in touch with Hurst.[61] Hurst's mother stated that Rayes also told her that he had to talk to the District Attorney.[62] Additionally, Hurst's mother testified that she assumed one reason Hurst may have been asking her to reach out to Rayes was for "some help[.]"[63]

Rayes, who was also a credible witness, testified that he talked to Hurst on the phone while he was in jail in Texas "maybe once or twice."[64] Rayes also said Hurst's mother called him "a couple of times" and he "just kind of strung her along[.]"[65] Rayes explained that, despite wanting Hurst to stay in jail for his safety, Rayes would string Hurst along by telling him the U.S. Attorney's Office was "looking at it, they're taking time, you know, they'll try and help you when they can[.]"[66] Rayes would also make an "empty promise . . . that [he] would convey [Hurst's] assistance to the U.S. Attorney's Office."[67] Rayes did tell McMahon that Hurst was "locked up" and wanting to know if "we're going to be able to help him[.]"[68] Ultimately, "[n]othing ever really materialized" and McMahon and Rayes agreed it was safer for Hurst to remain in

---

[60] Transcript of First Evidentiary Hearing, at 6–7, 10.
[61] *Id.* at 7.
[62] *Id.* at 10–11.
[63] *Id.* at 16.
[64] Transcript of Second Evidentiary Hearing, at 10.
[65] *Id.*
[66] *Id.* at 16–17.
[67] *Id.* at 23.
[68] *Id.* at 24.

jail.[69] However, Rayes was clear that he never specifically told Hurst he would be getting him out of jail.[70]

With respect to helping reduce Hurst's charges, Rayes told Hurst that he "would make his wishes known to the U.S. Attorney's Office. And if they could intercede, or, you know, try and get [Hurst] some better deal, that maybe they would[.]"[71] Rayes did not tell Hurst that the U.S. Attorney's Office *would* intercede, but only that Rayes would inform them that Hurst was cooperating and had been helpful.[72] Rayes emphasized that "it would be up to the U.S. Attorney's Office if they could do anything."[73] Rayes also specifically testified that—contrary to Hurst's assertion on the recordings—he never told Hurst that he or the U.S. Attorney's Office could get Hurst out of anything but murder.[74]

Rayes's testimony explains Hurst's belief that the government could assist him with his open charges and with his release from jail. However, nothing in Rayes's testimony suggests that the government made any undisclosed promises to Hurst. At trial, Hurst testified that the government told him if he told the truth, they would notify the East Baton Rouge Parish District Attorney's Office or the judge in East Baton Rouge Parish about his cooperation.[75] However, Hurst recognized that the U.S.

---

[69] *Id.*
[70] *Id.* at 17.
[71] *Id.* at 20.
[72] *Id.*
[73] *Id.*
[74] *Id.* at 30.
[75] R. Doc. No. 1584, at 227–28.

Attorney's Office did not have control over any sentence he might receive in East Baton Rouge Parish.[76]

After the trial, on December 2, 2019, the government sent a letter to the East Baton Rouge Assistant District Attorney.[77] The letter stated that Hurst testified at Esteves's and Brumfield's trial and that he was "an essential witness to the government's case, as he offered substantive testimony which led to the conviction of the defendants[.]"[78] The government also passed along Hurst's request that, based on safety concerns, he be relocated from the East Baton Rouge Parish Jail to a Department of Corrections facility.[79] This letter offers an explanation for the East Baton Rouge Parish prosecutor's assertion during Hurst's sentencing hearing "that the State took into consideration assistance that this defendant has provided to law enforcement in making this plea offer and that's the reason that we've made the offer that he pled to today."[80]

Based on the foregoing, Esteves has not met his burden of demonstrating that the government suppressed these calls. Esteves also has not met his burden of demonstrating that the government made promises to Hurst that were not disclosed before the trial or that it intervened in the resolution of Hurst's East Baton Rouge case in some undisclosed way. Rather, the government advised Hurst that it would

---

[76] *Id.* Hurst also told the jury that he was also motivated to testify by the $50,000 reward for information about the Loomis robbery. *Id.* at 228–29.
[77] R. Doc. No. 1798-1.
[78] *Id.* at 1.
[79] *Id.* at 1–2.
[80] R. Doc. No. 1791-1, at 28.

notify the East Baton Rouge Parish prosecutor and judge about his cooperation if he gave truthful testimony. Hurst told the jury about this arrangement at Esteves's trial. After the trial, the government did exactly what Hurst told the jury the government would do for him in exchange for truthful testimony: it notified the East Baton Rouge Parish prosecutor about Hurst's cooperation.

### ii. NOPD Incident Report

The second piece of evidence is an NOPD "incident report regarding Hurst's 2013 aggravated burglary charge that states that the victim was 'one hundred percent sure' that Hurst was the perpetrator." *Brumfield*, 89 F.4th at 514. "Hurst testified that the charges were dismissed because the witness mistakenly picked him in the photo lineup." *Id.* Neither Esteves's memorandum nor his supplemental briefing specifically mentions this NOPD incident report.

As the government observes,[81] the Court continued the trial from November 7, 2019 until November 11, 2019 when the government learned that the FBI was in possession of consensual recordings of telephone calls made by Hurst.[82] On November 8, 2019, the government provided Esteves with the FBI Confidential Informant File for Hurst.[83] The file contained a form titled "FBI Source Opening Communication," which stated on the first page that Hurst had an outstanding arrest warrant for aggravated burglary and it listed the NOPD as the relevant agency.[84]

---

[81] R. Doc. No. 1798, at 10.
[82] R. Doc. No. 719.
[83] *Id.*
[84] *Id.*; *see also* R. Doc. No. 1798-4 (FBI "Source Opening Communication" form for Hurst), at 1.

Esteves presented no evidence that the government or anyone on the prosecution team had this NOPD report in its possession. There is also no indication that the NOPD operated as part of the prosecution team in this matter. Esteves has not shown any "interaction and cooperation" between the prosecutors and the NOPD with respect to his case. *Antone*, 603 F.2d at 570. The report was therefore equally accessible to Esteves and the government. *See Mathis v. Dretke*, 124 F. App'x 865, 877 (5th Cir. 2005) (finding that evidence was not suppressed where the defendant's counsel "had equal access to it"); *Runyan*, 290 F.3d at 245–46 (explaining that the government is not required "to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own"). And, as the government points out, Esteves appears to have made no effort to obtain the NOPD report during the recess.[85]

Additionally, Esteves did not establish during the evidentiary hearings that the government assisted Hurst with respect to the dismissal of the aggravated burglary charges. To the contrary, McMahon testified that he had nothing to do with the dismissal of the 2013 aggravated burglary charges.[86] Specifically, McMahon denied contacting the NOPD to ask that Hurst's charges be reduced or dropped.[87] He also denied contacting anyone at the Orleans Parish District's Attorney's Office to provide a benefit to Hurst on the aggravated burglary charge.[88]

---

[85] R. Doc. No. 1798, at 10.
[86] Transcript of Second Evidentiary Hearing, at 34–35.
[87] *Id.* at 35.
[88] *Id.*

Likewise, Elmer—who was the FBI agent primarily responsible for using Hurst as a source from 2014 to 2015—credibly denied intervening in the state's decision to dismiss these charges and stated that he did not know why those charges were dismissed.[89] In his supplemental briefing, Esteves notes only that, in response to the question of whether NOPD Detective Christopher Harris, an NOPD officer who was also working as a task force police officer for Elmer's FBI squad, would have contacted the Orleans Parish District Attorney's Office to ask for assistance on the aggravated burglary charge, Elmer stated: "Not that I'm aware of."[90] Accordingly, the Court finds that Esteves has not satisfied his burden of showing that the government suppressed the NOPD incident report, nor has Esteves demonstrated that the prosecution team assisted Hurst with respect to the dismissal of the aggravated burglary charge and then failed to disclose that assistance.

### iii.  Brazoria County, Texas Investigation Report

The third category of evidence is an investigation report from Brazoria County, Texas "showing that Hurst (1) was arrested for possessing 37 stolen credit cards and controlled substances and (2) was later indicted for fraudulently possessing only two credit cards. At trial, Hurst testified only to the latter." *Brumfield*, 89 F.4th at 514.

---

[89] Transcript of Second Evidentiary Hearing, at 41–42 (Elmer explaining that he opened Hurst as a source in April 2014 and that Elmer transferred out of the FBI's Violent Crime Squad in September 2015); *id.* at 34–35 (Elmer explaining that he did not ask for any assistance with Hurst's aggravated burglary charges and does not know why those charges were dismissed).

[90] Transcript of First Evidentiary Hearing, at 35; R. Doc. No. 1817, at 5.

As with the NOPD incident report, Hurst's memorandum and supplemental briefing never specifically mention this investigation report.

The government argues that it did not have access to this report because "Brazoria County was not a member of the prosecution team."[91] The government also asserts that it "did not intervene and ask for consideration for Hurst."[92] Moreover, the government suggests that this evidence was "fully available" to Esteves "through the exercise of reasonable diligence."[93] This is because Hurst's criminal history report—which the government produced to Esteves—reflects Hurst's arrests and identifies the prosecuting agency that handled Hurst's arrest.[94]

As with the NOPD, there is no indication that anyone in Brazoria County was a member of the prosecution team. Esteves has not shown any "interaction and cooperation" between the prosecutors and anyone in Brazoria County with respect to his case. *Antone*, 603 F.2d at 570. Accordingly, the Court concludes that Esteves has not satisfied his burden of demonstrating that the government suppressed the Brazoria County investigation report. *See, e.g.*, *Runyan*, 290 F.3d at 245–46 (explaining that the government is not required "to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own").

---

[91] R. Doc. No. 1798, at 11.
[92] *Id.* at 12.
[93] *Id.* at 11 (quoting *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016)).
[94] *Id.*

Further, just as Esteves presented no evidence that the government intervened in the resolution of Hurst's aggravated battery charges, Esteves presented no evidence that the government intervened in the resolution of Hurst's Brazoria County credit card charges. To the contrary, Elmer specifically testified that he did not intervene with respect to the credit card charges.[95] Similarly, McMahon testified that he did not intervene with respect to these charges.[96] Accordingly, the Court concludes that Esteves has not satisfied his burden of demonstrating suppression with respect to the Brazoria County investigation report.

### iv. Baton Rouge Police Department Incident Report

The fourth piece of evidence is "[a] Baton Rouge Police Department incident report regarding Hurst's 2014 arrest for battery, which stated that an officer discovered that Hurst had an outstanding warrant for burglary issued by the NOPD. The report states that the officer was initially advised that the NOPD wanted Hurst booked, but that the officer was then advised by the NOPD to release Hurst because

---

[95] Transcript of First Evidentiary Hearing, at 59 (AUSA: "Could you have called the [Brazoria County] DA's Office back again and said that he is cooperating with us and we need assistance for him?" Elmer: "I suppose we could have if we felt like that was something that was necessary or that we had wanted to go that route in the case." AUSA: "You didn't do that, correct?" Elmer: "No.")

[96] Transcript of Second Evidentiary Hearing, at 35–36 (AUSA: "Did you have anything to do with those [Brazoria County credit card] charges differing from what was in the police report or what he might have gotten caught with initially?" McMahon: "Not at all." AUSA: "Did you contact anyone investigating Hurst's possession of credit cards to ask that charges be reduced because he was assisting the federal government in an important case?" McMahon: "No." AUSA: "Did you contact any prosecutors on that case seeking to provide a benefit to Hurst on those charges?" McMahon: "No.").

he was an informant." *Brumfield*, 89 F.4th at 514. Again, Esteves's memorandum and supplemental briefing do not directly address this incident report.

According to the government, "[t]his information was not suppressed as it was included in Hurst's FBI Confidential Informant File."[97] The government states that this file indicates that Hurst had an outstanding warrant for aggravated burglary and that the issuing agency was the NOPD, even designating NOPD Detective Christopher Harris as the official who was contacted.[98] Indeed, Esteves used this information to impeach Hurst during the trial.[99]

Additionally, there is no evidence that the government intervened with respect to the outstanding NOPD arrest warrant. Elmer testified that, when he first opened Hurst as a source in April 2014, he was aware that Hurst had an outstanding NOPD warrant for aggravated burglary.[100] Elmer further testified that he asked Harris, an NOPD officer who was also working as a task force police officer for Elmer's FBI squad, to investigate the NOPD warrant.[101] Harris contacted the Orleans Parish District Attorney's Office and requested permission to operate Hurst as a source.[102]

---

[97] R. Doc. No. 1798, at 12.

[98] *Id.*

[99] *Id.* at 12–13; *see also* R. Doc. No. 1585, at 103 (Esteves's trial attorney to Hurst: "And you also knew there was a warrant out for your arrest for aggravated burglary; correct?"); R. Doc. No. 1720, at 174 (Esteves's trial attorney arguing during closing arguments that Hurst was not a credible witness in part based on his "outstanding warrant for aggravated burglary from New Orleans").

[100] Transcript of First Evidentiary Hearing, at 28.

[101] *Id.* at 29–30.

[102] *Id.*

Graymond Martin, the former First Assistant to the District Attorney, granted that permission.[103]

However, Elmer stated that he had no role in the decision that was ultimately made by the NOPD and the Orleans Parish District Attorney's Office with respect to the warrant.[104] Specifically, Elmer testified:

> All we needed was permission to operate [Hurst] as a source. We didn't need to get involved with what his legal matters were at the time. We just weren't interested in doing that. We just wanted to know that -- as an agent, I didn't have an obligation to execute some portion of the law. If they wanted him arrested and wanted him to come to trial, then I certainly would have helped effect that arrest through Christopher Harris and NOPD.[105]

Esteves has not shown that the government intervened to assist Hurst with respect to the NOPD warrant. Rather, the testimony indicated that Elmer did not intervene "at all" with respect to the NOPD warrant.[106] Accordingly, there is no evidence of suppression with respect to the fourth category of evidence.

### v. Louisiana Department of Public Safety and Corrections File

The fifth category of evidence is "[a] Louisiana Department of Public Safety and Corrections file on Hurst, which states that Hurst had an active warrant issued by Texas and that 'Texas indicated that they were coming to get [Hurst].' Another entry states that Special Agent Elmer called on the same date that the Texas arrest warrant was issued and asked to speak with Hurst's supervising probation officer.

---

[103] *Id.*

[104] *Id.* at 30.

[105] *Id.* at 31.

[106] *Id.*

Another earlier entry notes that Special Agent Elmer called in October 2014 seeking Hurst's contact information and stating that he was trying to retrieve 'some type of FBI issued equipment.'" *Brumfield*, 89 F.4th at 514. Esteves's memorandum and supplemental briefing do not specifically address that file.

The government argues that this evidence was not suppressed because "the Louisiana Department of Public Safety and Corrections was not part of the government's prosecution team."[107] The government states that the department did not play a role in the investigation of Esteves's criminal case, no member of the department participated in Hurst's arrest, and the department maintained its records in a database that was inaccessible to the government.[108] Accordingly, the government contends that it had no obligation to obtain that file.[109]

Moreover, during the first evidentiary hearing, Elmer testified that, in April 2014, he opened Hurst as a source regarding a suspect's involvement in the Loomis robbery.[110] Elmer also testified that, around the same time, he contacted McMahon about opening Hurst as a source despite a pending investigation into Hurst in Texas and an outstanding NOPD warrant.[111] Elmer explained that he did so pursuant to the FBI's standard practice of alerting the U.S. Attorney's office about any pending criminal investigations involving a potential source.[112] Specifically, Elmer advised

---

[107] R. Doc. No. 1798, at 13.
[108] *Id.*
[109] *Id.*
[110] Transcript of First Evidentiary Hearing, at 20.
[111] *Id.* at 25–26.
[112] *Id.* at 24–25.

McMahon about the investigations so McMahon "could make any strategic decisions he needed to about the case and whether . . . it would be a source that we should open and use based on how he would eventually prosecute the case."[113]

As explained, Texas issued a warrant for Hurst in April of 2015.[114] Elmer testified that he had not been in constant contact with Hurst from the time he opened Hurst as a source in 2014 until the Texas warrant was issued in 2015.[115] Once Hurst had given the FBI all the information he had, "[Hurst] went his way and [Elmer] went [his] with [his] investigation, and [they] didn't have any contact."[116] Elmer further testified that, after he learned about the Texas arrest warrant for Hurst in April 2015, he called Hurst's Louisiana parole officer.[117] Elmer asserted that he called the parole officer for two reasons. First, he called "to see if there was anything we needed to do with that arrest warrant," meaning to determine whether the FBI should terminate Hurst as a source, find additional information, or take a different step.[118] Second, he called to obtain Hurst's contact information so that he could contact Hurst regarding the return of FBI-issued equipment.[119] Additionally, Elmer testified that he did not intervene with respect to the Texas arrest warrant.[120]

---

[113] *Id.* at 26.

[114] *See id.* at 38–40.

[115] *Id.* at 41.

[116] *Id.*

[117] *Id.* at 38.

[118] *Id.* at 38–40.

[119] *Id.* at 38.

[120] *Id.* at 40.

The Court finds that Esteves has not met his burden of demonstrating that the government suppressed the Louisiana Department of Public Safety and Corrections file. As noted, Esteves does not contend that the government had access to this file but failed to disclose it. Additionally, Esteves has not shown that Elmer contacted Hurst to offer additional undisclosed benefits. Rather, Elmer contacted Hurst's parole officer to learn more about his arrest so that the FBI could decide whether to continue using Hurst as a source or take a different course of action, and to obtain Hurst's contact information so he could contact Hurst regarding the return of equipment the FBI had issued to him earlier. None of this demonstrates suppression on the government's part.

*vi. Hurst's 2019 Arrest in East Baton Rouge Parish*

As explained, Esteves's memorandum does not directly address the five categories of evidence listed by the Fifth Circuit in its order remanding this matter. Instead, Esteves argues more generally that the government must have suppressed evidence of additional benefits to Hurst that were not disclosed at trial.[121]

Specifically, Esteves notes that, on September 3, 2019, Hurst was arrested and brought to Baton Rouge Parish Prison after being charged with one count of simple burglary and one count of simple criminal damage to property.[122] On September 4, 2019, Hurst was brought before the East Baton Rouge Parish court for an initial

---

[121] *See generally* R. Doc. No. 1791.
[122] *Id.* at 8; *see also* R. Doc. No. 1791-1, at 1.

appearance.[123] The court set bail at $10,000.[124] The next day, on September 5, 2019, Hurst was arrested again and charged with one count of home invasion, four counts of aggravated assault, one count of felony sexual battery, and one count of felony indecent behavior with juveniles.[125] At his initial appearance on September 6, 2019, the court set bail at $100,000.[126]

Esteves states that online records for the Clerk of Court for East Baton Rouge Parish indicate that "Hurst had three [ ] separate arrest warrants filed against him in the first half of 2018."[127] The first warrant, dated February 14, 2018, relates to Hurst's charges of simple burglary and simple criminal damage to property.[128] The second warrant, dated April 3, 2018, pertains to Hurst's sexual battery and indecent behavior with juveniles charges.[129] The third warrant, dated June 8, 2018, pertains to Hurst's charges for home invasion and aggravated assault.[130]

Esteves further asserts that, on November 6, 2019, during Esteves's trial, "Hurst stated that he 'hoped' that someone from the government would reach out to the [D]istrict [A]ttorney or judge in his pending East Baton Rouge case, but that he had not yet received any assistance with that matter."[131] The Court notes that Hurst testified that the government said "if [Hurst] tell[s] the truth, [the government] might

---

[123] R. Doc. No. 1791-1, at 2.

[124] *Id.*

[125] *Id.* at 3.

[126] *Id.* at 2.

[127] R. Doc. No. 1791, at 9.

[128] R. Doc. No. 1791-1, at 6–9.

[129] *Id.* at 10–13.

[130] *Id.* at 14–16.

[131] R. Doc. No. 1791, at 8 (citing R. Doc. No. 1584, at 227–28).

speak with the [East Baton Rouge Parish District Attorney]" and inform the District Attorney or the judge in that case "of any cooperation [Hurst] would give[.]"[132]

Esteves contends that "[t]he charges of [a]ggravated [b]urglary, [s]imple [b]urglary[,] and [s]imple [c]riminal [d]amage to [p]roperty [ ] were billed as [s]imple [b]urglary ([f]elony) [ ] on November 27, 2019."[133] On the same day, the East Baton Rouge District Attorney filed a bill of information charging Hurst with one count of attempted armed robbery and one count of home invasion.[134]

On December 11, 2020, Hurst pleaded guilty to one count of simple robbery.[135] In court, Hurst stated that he agreed only "[s]omewhat" with the factual basis provided by the state.[136] Hurst's lawyer clarified that Hurst's plea was "akin to an *Alford* plea[.]"[137] The state explained that it had "only read facts that would be supportive of the amended charge of simple robbery[.]"[138] The court accepted Hurst's guilty plea and sentenced him to one year in in East Baton Rouge Parish Prison with credit for time served.[139] The remaining charges against Hurst in connection with the

---

[132] R. Doc. No. 1584, at 227–28.

[133] R. Doc. No. 1791, at 9. The Court understands Esteves's reference to aggravated burglary to be a reference to aggravated assault, as there is no indication that Esteves was charged with aggravated burglary. *See id.*; *see also* R. Doc. No. 1791-1 (Esteves's exhibits pertaining to Hurst's criminal records, which do not reference aggravated burglary but do reference aggravated assault).

[134] R. Doc. No. 1791, at 9; *see also* R. Doc. No. 1791-1, at 18 (bill of information).

[135] *See generally* R. Doc. No. 1791-1 (transcript of Hurst's rearraignment and sentencing at the East Baton Rouge Parish Courthouse on December 11, 2020), at 19–30.

[136] *Id.* at 26–27.

[137] *Id.* at 27.

[138] *Id.*

[139] *Id.* at 28.

first and third warrants were dismissed.[140] As already noted, the state prosecutor advised the court on the record "that the [s]tate took into consideration assistance that this defendant has provided to law enforcement in making this plea offer and that's the reason that we've made the offer that he pled to today."[141] According to Esteves, the matter pertaining to Hurst's sexual battery and indecent behavior with juveniles charges was "no-billed" on September 30, 2020.[142]

Esteves's memorandum assigns great significance to this timeline. Just weeks after Esteves's trial ended, the East Baton Rouge District Attorney's office filed lesser charges against Hurst than those for which he was arrested and it did not file any charges based on Hurst's arrest for sexual battery and indecent behavior with juveniles.[143] According to Esteves, "[i]t is apparent that [ ] Hurst was the beneficiary of significant government assistance with his East Baton Rouge charges[,]" particularly in light of the state's comments at Hurst's sentencing.[144] In his reply, Esteves suggests that this assistance may have come from Rayes based on Hurst's discussions with his mother in the previously discussed recorded phone calls.[145] Esteves therefore contends that the government's failure to disclose Hurst's arrangements with federal agents and these allegedly resulting plea offers violated

---

[140] *See id.* at 27–28.
[141] *Id.* at 28.
[142] R. Doc. No. 1791, at 9.
[143] *See id.* at 10–12.
[144] *Id.* at 11.
[145] *See* R. Doc. No. 1803, at 3.

*Giglio* and that the government's act of allowing Hurst to lead the jury to believe that he could only hope for some sort of assistance with those charges violated *Napue*.

In response, the government first emphasizes that Hurst's 2019 East Baton Rouge Parish arrests were not mentioned in Esteves's original motion for a new trial or addressed on appeal.[146] Accordingly, it argues that these arrests are "beyond the scope of the remand."[147] Nevertheless, the government agrees that Hurst's testimony at Esteves's trial indicated that Hurst hoped the government would notify the East Baton Rouge Parish District Attorney's office of his cooperation.[148] According to the government, after Esteves's trial, it "notified the [D]istrict [A]ttorney's office that Hurst had testified, but only asked that the office consider relocating Hurst due to concerns for his safety."[149] The government stresses that it "did not address Hurst's charges[] and did not ask that any consideration be given to him in exchange for his cooperation."[150] The government contends that it disclosed all benefits afforded to Hurst and that Hurst testified truthfully at Esteves's trial about his desire to receive a benefit in exchange for his cooperation.[151]

As explained throughout this order and reasons, Esteves has not met his burden of demonstrating that the government failed to disclose any promises it made to Hurst with respect to the East Baton Rouge charges. Rayes's testimony about the

---

[146] R. Doc. No. 1798, at 14.
[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.* at 14–15.

"empty promises" he made to Hurst regarding advising the U.S. Attorney's Office that Hurst was requesting assistance is consistent with what the jury heard at trial. And the East Baton Rouge Parish state prosecutor's remarks during Hurst's sentencing are consistent with the U.S. Attorney's Office having advised state prosecutors that Hurst testified at Esteves's and Brumfield's trial. Esteves's speculation that the government must have suppressed evidence based on seemingly favorable treatment Hurst received simply does not satisfy his burden of demonstrating that evidence was actually suppressed.

### b.  Favorability

Because the Court finds that Esteves has not met his burden of showing that the government suppressed evidence in this matter, the Court need not reach the question of favorability.

### IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Esteves's request for a new trial is **DENIED**.

New Orleans, Louisiana, May 17, 2024.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**